IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| THOMAS H. REED, JR. & LORE REED | * | |
| Plaintiffs | * | |
| vs. | * | Civil Action No: 03CV360 |
| JAMES F. KNOTT REALTY GROUP, et al. | * | |
| Defendants | * | |

\* \* \* \* \* \* \* \* \*

## AFFIDAVIT OF DAVID MCMASTERS

My name is David McMasters. I am over 21 years of age and am competent to testify.

I am employed by James F. Knott Construction Company, Inc. On the date of loss alleged in this accident, February 8, 2000, I was employed by Knott as a site superintendent and was working at a construction site for renovations at an industrial park type building located at 9003 Yellow Brick Road in White Marsh, Maryland.

James F. Knott Construction Company, Inc. was the general contractor for the renovations at this site. Knott was hired by the landowner to do the renovations. Knott subcontracted part of the work to Keystruct Constructions, Inc., pursuant to a written contract. Thomas Reed is known to me to be an employee of Keystruct.

James F. Knott Construction Company, Inc. was not the owner of these premises and did not function as the leasing company, or in any other fashion represented the premises owner, except as general contractor for the construction project.

James F. Knott Construction Company, Inc. did not undertake to remove snow or ice from these premises.

I was present at the accident site on the date of the accident as alleged. I saw no ice patches in the front of the building. I was called to the back lot, as a result of Mr. Reed's fall. For the first time I observed small ice patches is several areas on the back lot. There were large areas of the back lot with no ice present and the patches could be walked around with ease.

I do solemnly swear and affirm, under the penalties of perjury, that the aforegoing statements are true and correct to the best of my knowledge, information and belief.

10/24/03
Date

David McMasters

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| THOMAS H. REED, JR. & LORE REED | * | |
| Plaintiffs | * | |
| vs. | * | Civil Action No: 03CV360 |
| JAMES F. KNOTT REALTY GROUP, et al. | * | |
| Defendants | * | |

\* \* \* \* \* \* \* \* \*

## AFFIDAVIT OF STEPHEN ENDRES

My name is Stephen Endres. I am over 21 years of age and am competent to testify.

I am the comptroller for a group of Knott companies, specifically James F. Knott Realty, Inc.; James F. Knott Development Corporation; James F. Knott Property Management, Inc.; and James F. Knott Construction Co., Inc. . As such I am familiar with the records and relationships of the corporations related to James F. Knott.

Yellow Brick Road Limited Partnership is the owner of premises known as 9003 Yellow Brick Road. A lease dated June 28, 1990 establishes that these premises were leased to Notes & Queries, Inc. on the date of loss, February 8, 2000, alleged in this complaint. James F. Knott Property Management Inc. was the managing entity for the Yellow Brick Road property listed above.

James F. Knott Realty Group is not a legal entity, merely a trade name for a group of Knott related entities. James F. Knott Development Corporation is a related corporation with some ownership interest by James F. Knott.

I do solemnly swear and affirm, under the penalties of perjury, that the aforegoing

statements are true and correct to the best of my knowledge, information and belief.

10/24/03
Date

*[signature]*
Stephen Endres.

COPY

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

THOMAS H. REED, JR., et al,    :

      Plaintiffs             :

   vs.                         :   CIVIL ACTION NO.

JAMES F. KNOTT CONSTRUCTION    :   S-02-874

COMPANY, INC., et al           :

      Defendants             :

--------------------

Deposition of THOMAS H. REED, JR., taken

on Wednesday, August 14, 2002, at 1:25 p.m., at

the Law Offices of Ferguson, Schetelich & Ballew,

100 South Charles Street, Baltimore, Maryland,

before CARLA M. SINCLAIR, Notary Public.

--------------------

Reported by:

CARLA M. SINCLAIR, RPR, CRR

Page 10

1　A. '89.
2　Q. How long did that course last?
3　A. Three months.
4　Q. Did you complete the course?
5　A. For what was supposed to go -- it was
6　at work. It wasn't like a diploma. I got
7　credits of hours for what they needed.
8　Q. You were sent there by a construction
9　company?
10　A. No. I worked for a trash bailer, crane
11　builder. They sent us there to help us
12　understand making the parts.
13　Q. When did you go to the carpentry
14　program?
15　A. That was in 2001.
16　Q. Why did you go there?
17　A. Our employer had asked us if we wanted
18　to further our education in carpentry or any
19　other thing, and I took him up on it, and that's
20　the program I went through.
21　Q. Did you finish the program?

Page 11

1　A. Yes.
2　Q. What did you learn in that program?
3　A. All carpentry, masonry skills, general
4　layout. Pretty much all carpentry.
5　Q. Do you apply any of the skills in your
6　position currently?
7　A. Yes.
8　Q. Any other technical training or
9　education?
10　A. Nothing. We get certified for forklift
11　training, such as that, and Hilte guns, and
12　certain power equipment we use.
13　Q. That's certification through the
14　manufacturer?
15　A. Right.
16　Q. Have you attended any other schools?
17　A. No, sir.
18　Q. Who is your present employer?
19　A. Keystruct Construction.
20　Q. When did you begin working for
21　Keystruct?

Page 12

1　A. May of '99.
2　Q. What's your job description?
3　A. Job description, carpenter.
4　Q. What was your job description in
5　February of 2000?
6　A. Carpenter.
7　Q. Who did you work for before Keystruct?
8　A. Norfolk Southern Railroad. Real
9　Services, I was there a couple months.
10　Q. Real Service?
11　A. Real Services, Incorporated.
12　Q. What did you do with Real Services?
13　A. Carpentry.
14　Q. Where are they located?
15　A. In York.
16　Q. Are they still in business?
17　A. Yes.
18　Q. What time frame did you work for Real
19　Services?
20　A. Real Services, for three months before
21　May of '99. Like from February to May.

Page 13

1　Q. Before Real Services?
2　A. Norfolk Southern Railway.
3　Q. What capacity?
4　A. What's that?
5　Q. What was your job?
6　A. Track foreman.
7　Q. When did you work for Norfolk?
8　A. October, '92 to January, '98, '99.
9　Q. Did you leave Norfolk Southern
10　voluntarily?
11　A. Yes.
12　Q. Why did you leave?
13　A. To be with my children.
14　Q. Where was your job at the time?
15　A. In Georgia.
16　Q. Where were your children?
17　A. They were at home. I was on the road.
18　They sent me on the road, had me traveling,
19　leaving Sunday and coming back on Fridays.
20　Q. Why did you leave Real Services?
21　A. There was no benefits, low pay, and just

August 14, 2002

Case 1:03-cv-00360-JKB   Document 13-2   Filed 10/31/2003   Page 7 of 12

Multi-Page Deposition of Thomas H. Reed, Jr.
Thomas H. Reed, Jr. vs. James F. Knott Construction Co., Inc.

Page 30

1  Q. Since you turned 18 years of age, have
2  you been convicted of any criminal offense?
3  A. No.
4  Q. Is Mr. Oare representing you in the
5  Workers' Compensation case?
6  A. Yes.
7  Q. Have you been sent to my doctors by your
8  attorneys with regard to your leg injury?
9  A. No.
10 Q. Have you been evaluated by any doctor
11 for the purpose of establishing an impairment or
12 a disability rating?
13 A. What's that?
14 Q. Have you been seen by any doctor for the
15 purpose of being evaluated for a disability or an
16 impairment rating?
17 A. Not to my knowledge.
18 Q. Do you know what the question means?
19 A. No, I don't understand it.
20 Q. Has any doctor seen you and told you
21 that you have a certain percentage of disability

Page 31

1  or impairment to your leg as a result of this
2  injury?
3  A. Dr. Hofmann, the pain.
4  Q. Did Dr. Hofmann give you a specific
5  number as far as any permanency or impairment to
6  your leg?
7  A. No.
8  Q. Let's talk about the incident itself.
9  When did it last snow before the incident?
10 A. I'm not sure of an exact date.
11 Q. Was it within a week?
12 A. Within a week, I would say yes.
13 Q. Had you been at the premises -- strike
14 that.
15    This injury occurred on February 8 of
16 2000, correct?
17 A. Right.
18 Q. I will proffer to you that February 8 of
19 2000 was a Tuesday.
20 A. Correct.
21 Q. Do you remember whether you were at that

Page 32

1  site the day before, Monday, February 7?
2  A. No, I was not.
3  Q. When was the last time you were at that
4  site?
5  A. The general site?
6  Q. Yes.
7  A. The week before.
8  Q. Do you remember what day?
9  A. At the job, I was there a week.
10 Q. You were there all five days the
11 previous week?
12 A. As far as I know, yes.
13 Q. What was your job at that time?
14 A. What I done? I was a carpenter.
15 Q. What were you assigned to do at that
16 site?
17 A. Busting holes in the wall, the grout, to
18 strengthen the walls. They were falling down.
19 Q. Did your work involve the entire
20 building?
21 A. At certain times it is broken up, yes.

Page 33

1  Q. What do you mean by that?
2  A. Different people in the building. The
3  whole building was falling down.
4  Q. What do you understand -- strike that.
5    What was Keystruct's responsibility at
6  that project?
7  A. To reinforce the walls.
8  Q. From the inside?
9  A. Yes.
10 Q. Do you know whether the entire building
11 was occupied?
12 A. I'm not a hundred percent sure if the
13 whole building was.
14    MR. OARE: Counsel, so that I'm clear,
15 when you say the whole building, are you
16 referring to Notes & Queries or are you referring
17 to the entire structure, which consists of
18 multiple stores?
19    MR. BASILE: Correct. That's what I'm
20 saying.
21 A. At the time the parts of the building we

Page 46

1  A. The main entrance is over here.
2     MR. STEBENNE: For the record, is that
3  by Yellow Brick Road?
4     THE WITNESS: Yes.
5     MR. BASILE: I was going to ask him to
6  mark it.
7     MR. STEBENNE: I'm sorry.
8  Q. Put an A in the area of the main front
9  entrance to Notes & Queries.
10 A. To my knowledge, it is here.
11 Q. Where did you enter the building on
12 February 8 of 2000?
13 A. At what time?
14 Q. Why don't we do it this way. What time
15 did you leave your house on February 8 of 2000?
16 A. Around 5 to 5:30, in that area.
17 Q. Who was driving that day?
18 A. I was.
19 Q. Were you using a company truck?
20 A. No.
21 Q. Using your own personal vehicle?

Page 47

1  A. Yes.
2  Q. What time did you pick up Steve Shields?
3  A. Approximately 5:30.
4  Q. Does he live nearby?
5  A. No. We met at a designated location.
6  Q. Did you drive straight down to
7  Baltimore?
8  A. Yes.
9  Q. What time did you arrive at Yellow Brick
10 Road?
11 A. Approximately 6:45.
12 Q. When you arrived at 6:45, did you park
13 your car in the area where you have written car
14 on Exhibit No. 1?
15 A. Yes.
16 Q. What time did you enter the building?
17 A. Approximately 8 o'clock.
18 Q. What did you do between 6:45 and 8
19 o'clock?
20 A. This area here to the left, away from
21 Yellow Brick Road, is the day we had to work

Page 48

1  there. There's a machine shop. We was working
2  there until Notes & Queries was opening up the
3  building.
4  Q. That's the area in which you have
5  written forklift?
6  A. Right.
7  Q. What did you do in the area that you
8  have marked forklift between 6:45 and 8 o'clock?
9  A. Get holes prepped for grouting,
10 reinforcing.
11 Q. How did you get into that portion of the
12 building?
13 A. They open up at 7.
14 Q. So you waited until 7 o'clock?
15 A. Yes.
16 Q. And somebody let you in?
17 A. Yes.
18 Q. Do you remember the name of the business
19 that was working in that space?
20 A. No.
21 Q. Are there stairs that go into that

Page 49

1  portion of the building or is that a street
2  level?
3  A. In the front?
4  Q. In the front.
5  A. Street level.
6  Q. When you exited your car after parking
7  it that morning, did you see any snow in the
8  area?
9  A. Yes.
10 Q. Was there any snow in the parking lot in
11 the front?
12 A. In the front?
13 Q. Yes.
14 A. It was pushed to the edge.
15 Q. Was there any snow at all in the parking
16 lot itself, other than up against the edge of the
17 building or the edge of the lot?
18 A. In the parking lot, no, that I can
19 remember.
20 Q. Did you see any ice at all in the front
21 of the building?

Page 50

1 A. No.
2 Q. Any ice in the parking lot?
3 A. No.
4 Q. How far did you have to walk from your
5 car to get into the space next to Notes &
6 Queries?
7 A. I would say approximately a hundred, a
8 hundred and fifty feet.
9 Q. Did you have to walk on any snow or ice
10 to get there?
11 A. On the front of the building?
12 Q. Yes.
13 A. On the curb, no.
14 Q. You qualified your answer. Did you have
15 to walk on any snow or ice at any point before
16 you walked into the space marked as forklift?
17 A. No.
18 Q. How long did you work within the space
19 that you marked as forklift before you actually
20 left that space that day?
21 A. Approximately an hour.

Page 51

1 Q. What did you do when you left that area?
2 A. Left this area with the forklift,
3 machine shop, and went back to Notes & Queries to
4 see if they opened up let's say 8 o'clock to get
5 tools and equipment ready to carry down to this
6 place because we hadn't, I hadn't been there.
7 That's forklift, that's tools and equipment was
8 staged there.
9 Q. How long had the tools and equipment
10 been staged there?
11 A. A couple weeks at least.
12 Q. Who was responsible for storing them
13 away at the end of each workday?
14 A. Us, Keystruct.
15 Q. Were the tools and the equipment
16 Keystruct's or did they belong to somebody else?
17 A. Keystruct.
18 Q. Who authorized Keystruct to store tools
19 and equipment within Notes & Queries' space?
20 A. Knott.
21 Q. Knott Construction?

Page 52

1 A. (Nodding head indicating yes.)
2 Q. How do you know that?
3 A. From our superintendent telling us that
4 Knott had designated this space for us.
5 Q. How do you know that that space is space
6 that was leased by Notes & Queries?
7 A. Because it was their building and their
8 equipment back there.
9 Q. How do you know that it was their
10 building and their equipment back there?
11 A. Because of Knott Construction and Notes
12 & Queries management.
13 Q. What do you mean because -- did
14 somebody say that to you?
15 A. Yes.
16 Q. Somebody told you, this is our space,
17 you can store it here?
18 A. Yes.
19 Q. Somebody from Notes & Queries told you
20 that?
21 A. And Knott Construction.

Page 53

1 Q. Who told you from Notes & Queries?
2 A. The manager.
3 Q. Who is the manager?
4 A. I'm not sure.
5 Q. Can you describe the manager?
6 A. He's a man.
7 Q. Is he -- what race is he?
8 A. White.
9 Q. How old is he?
10 A. I ain't sure. Older than me.
11 Q. Would you say he was in his 40's or 50's
12 or older or younger than that?
13 A. To my knowledge, I would say late 30's
14 to 40's.
15 Q. Tall or short?
16 A. Medium. Medium build.
17 Q. Did he have any facial hair?
18 A. I don't remember.
19 Q. Did he have a full head of hair?
20 A. To my knowledge, he had most of his
21 hair.

Page 74

1  A. At the time or now?
2  Q. At the time on February 8, 2000.
3  A. At the time I didn't know who was
4  responsible for snow and ice removal.
5  Q. But you since learned that?
6  A. Right.
7  Q. Who do you understand to have been
8  responsible?
9  A. Responsible for snow removal was
10 Hollins & Company.
11 Q. Do you know whether Hollins was required
12 to treat any ice?
13 A. To my knowledge, no.
14 Q. Have you ever spoken with anybody
15 employed by Hollins?
16 A. No.
17 Q. Has anybody ever told you, when I say
18 anybody, anybody from your wife, to a supervisor
19 at work, to anybody at Notes & Queries, or Knott,
20 has anybody ever told you anything about what
21 Hollins was required to do or responsible to do

Page 75

1  for maintaining any of the areas you were working
2  on that day?
3  A. I don't recall who had given me the
4  information, but I remember that they were
5  responsible for removing the snow.
6  Q. The snow?
7  A. Yes.
8  Q. Somebody told you that?
9  A. (Nodding head indicating yes).
10 Q. You don't remember who told you?
11 A. I'm not a hundred percent sure.
12 Q. For the record, you nodded your head.
13 Did someone tell you that?
14 A. Yes.
15 Q. Did they tell you on the day of the
16 accident or sometime afterwards?
17 A. Long after I realized that Hollins was
18 even involved.
19 Q. At the time that you fell, up to that
20 point you didn't know who was responsible for
21 removing snow or maintaining the parking lot?

Page 76

1  A. No.
2  Q. Looking at that Exhibit 1, again, where
3  the stick figure is where I believe you have
4  drawn generally where you fell in relation to the
5  building, the white area between where it says
6  Knott Construction, owner of property, to where
7  you have drawn yourself, what is that area? What
8  does it consist of?
9  A. As in the parking lot itself?
10 Q. Is this a parking lot in the back?
11 A. It's a loading dock area.
12 Q. It is not where the public goes?
13 A. No.
14 Q. The parking lot you were referencing is
15 at the top of the page near where your car is
16 located or where your car is located on the
17 diagram? That's the parking lot?
18 A. Right. That's for persons working or
19 going to the company.
20 Q. Had you walked on that parking lot or
21 loading dock area in the back of the building

Page 77

1  prior to falling that day?
2  A. No.
3  Q. Had you ever walked back there during
4  the prior week?
5  A. At the front of the building up toward
6  the Yellow Brick Road, we would come out there
7  one day to move, pull a piece of steel out, and
8  to get it in the door.
9  Q. Had you ever slipped there before?
10 A. No.
11 Q. Do you know if anyone else had slipped
12 there?
13 A. To my knowledge, no.
14 Q. You mentioned a patch of ice. You said
15 it was somewhere between two and five feet. Was
16 it smaller than this table?
17 A. To my knowledge, I know I was laying on
18 it. So I would say it is bigger than two. At
19 least my size.
20 Q. Did anybody ever tell you where it came
21 from or what caused the ice to form?

Page 114

1  A. The lower leg and two -- yes.
2  Q. We can also see a little bit of what
3 appears to be a surgical site just over the very
4 top of your kneecap.
5  A. Correct.
6  Q. Are there any other areas of surgery or
7 scarring now that are not shown on this
8 photograph? In other words, did this photograph
9 get them all?
10  A. Yes. The holes from surgery.
11     MS. GERBES: Counsel, I ask when you get
12 time, if you can get me color copies of those,
13 that would be great.
14  Q. Those are the only photographs you know
15 of, other than you know the carrier took some,
16 but you don't know what they are of?
17  A. Right.
18  Q. You never went back and took any
19 pictures around the area of Yellow Brick Road?
20  A. No.
21  Q. Now, you told us before that you had

Page 115

1 worked at the Yellow Brick Road site the entire
2 week before the accident, correct?
3  A. Pretty much.
4  Q. You told me before you couldn't remember
5 when it had snowed, but you felt it was within
6 the week, correct?
7  A. To my knowledge, yes.
8  Q. Do you remember being at Yellow Brick
9 Road when it was snowing or you just remember
10 snow on the ground?
11  A. I remember it snowing at one time. It
12 was either like in January. One day we was there
13 and it started snowing.
14  Q. You told us that you were not at that
15 jobsite on the Monday, the day before the 7th,
16 correct?
17  A. Correct.
18  Q. Would I take it then Friday, the 4th,
19 would be the last day you were at the site?
20  A. I guess.
21  Q. Do you recall on Friday the 4th if there

Page 116

1 was snow on the ground?
2  A. To my knowledge, I don't know.
3  Q. You don't know?
4  A. No.
5  Q. About what time in the morning did your
6 fall occur?
7  A. Approximately 8:20, 8:30.
8  Q. What was the weather like that day?
9  A. Cold.
10  Q. Was it overcast?
11  A. Like cloudy. A little overcast.
12  Q. Any precipitation that day?
13  A. No.
14  Q. You said cold. Was it below freezing?
15  A. It was cold.
16  Q. Do you know if it was at or below
17 freezing?
18  A. No.
19  Q. You indicated the surface back there at
20 the loading dock is concrete, correct?
21  A. At the loading dock, yes.

Page 117

1  Q. Is that the same surface that you fell
2 on?
3  A. Yes.
4  Q. Are we talking like the grayish-beige
5 color concrete?
6  A. Whitish-gray.
7  Q. The nearest accumulation of snow, how
8 far away from where you fell was the nearest pile
9 or however it was done?
10  A. I would say, to my knowledge, 10 or 15
11 feet.
12  Q. By that you are referring to the edge of
13 the building?
14  A. Right.
15  Q. Was it all along the edge of the
16 building or just in certain areas they had piles
17 of it?
18  A. I'm not sure.
19  Q. That morning, did you see any ice prior
20 to your fall?
21  A. No.

Page 118

1  Q. My understanding, it wasn't until after
2  you were on the ground you realized there was
3  ice, is that correct?
4  A. Right.
5  Q. Were you aware of not necessarily seeing
6  it, but aware of there being any ice on the
7  ground that morning?
8  A. No.
9  Q. Do you know whether Knott Construction,
10 Notes & Queries, or anybody else involved in this
11 incident was aware of any ice being on the ground
12 that morning?
13 A. Not that I was aware of.
14 Q. Looking at your diagram, which I believe
15 is right in front of you, Exhibit No. 1, there's
16 on the, about halfway down the actual paper on
17 the bottom side, there's a bunch of brackets that
18 almost look like staples. Are those to designate
19 loading dock doors?
20 A. Yes.
21 Q. As far as the diagram is concerned, and

Page 119

1  I realize it may not be totally accurate, it
2  looks like eight loading docks for the Notes &
3  Queries section.
4  A. From what I remember.
5  Q. I just want to make sure that's what
6  those were.
7     Got to ask you a couple more questions
8  about that comment about Knott, or your attorney,
9  or insurance rep, or somebody offering you some
10 money. Did this conversation occur with you
11 directly?
12 A. (Shaking head indicating no.)
13 Q. You are shaking your head no?
14 A. No.
15 Q. Were you made aware of the conversation
16 with your attorney, is that what you are
17 referring to?
18 A. Yes.
19 Q. This is after the lawsuit was filed?
20 A. Yes.
21 Q. When you were asked before the people

Page 120

1  who were at the scene afterwards, I'm looking at
2  the answers to interrogatories that you did, this
3  happens to be the set for Hollins & Company,
4  there's a few other names on here. I want to
5  check with you.
6     You have a Bobby Gladfelter,
7  G-L-A-D-F-E-L-T-E-R, listed on here. Who is
8  Bobby Gladfelter?
9  A. He was a supervisor for Keystruct.
10 Q. Was he there that morning?
11 A. No.
12 Q. So he was not an eyewitnesses to this?
13 A. No.
14 Q. We have to make that correction on the
15 answers to interrogatories.
16 A. Is that for that day?
17 Q. It says, state the name, address, and
18 telephone numbers of eyewitnesses to all or part
19 of the occurrence, and give the location of each
20 witness at the time of the occurrence.
21    So he was not there that day, is that

Page 121

1  correct?
2  A. Not that day. That question was, you
3  can see, is vague.
4  Q. I'm trying to figure out this stuff.
5     There's a Bruce Traggorth,
6  T-R-A-G-G-O-R-T-H. Who is that?
7  A. To my knowledge, he was another
8  superintendent for Knott.
9  Q. Was he there that day?
10 A. Not that I remember.
11 Q. Do you know why he is listed? Did you
12 have any conversation with him?
13 A. He was just there off and on a couple
14 times we was there.
15 Q. Do you know that he has any knowledge
16 whatsoever about your fall or the conditions
17 there that day?
18 A. Other than if Knott told him or Dave
19 told him. Other than that, I don't know if he
20 knows anything.
21 Q. If one of them told him, you don't know